505 So.2d 775 (1987)
Peter Frank SMICIKLAS, et al., Plaintiffs-Appellants,
v.
GROENDYKE TRANSPORT, INC., et al., Defendants-Appellees.
Gary CHAMPION, et al., Defendants-Appellees,
v.
SENTRY INSURANCE, A Mutual Company, et al., Defendants-Appellants.
Nos. 18477-CA, 18478-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1987.
Writ Denied May 25, 1987.
*776 Peters, Ward, Bright & Hennessy by J. Patrick Hennessy and Larry Johnson, Shreveport, for Peter Frank Smiciklas and Susan Durden Smiciklas.
Boles, Boles & Ryan by William R. Boles, Jr., Monroe, for Groendyke Transport, Inc., Gary Charles Champion and North Star Reinsurance Corp.
Bodenheimer, Jones, Klotz & Simmons by Mary L. Coon Blackley, Shreveport, for intervenor, Sentry Ins. Co.
Mathews, Atkinson, Guglielmo, Marks & Day by John W. Perry, Jr., Baton Rouge, for Ace Hardware Corp. and Sentry Ins. Co.
Before HALL, MARVIN and NORRIS, JJ.
NORRIS, Judge.
The plaintiffs, Peter and Susan Smiciklas, appeal a jury verdict which dismissed their claims for personal injury and related relief from the head-on collision of two 18-wheelers. Joining in the appeal are Smiciklas's employer and workers comp carrier. The defendant, Gary Champion, was found free of fault in the collision. Appellants now complain that the jury instructions were confusing and erroneous and that the verdict is manifestly erroneous. For the reasons expressed, we affirm.

*777 FACTS
Both Smiciklas and Champion were professional truck drivers on the date of the accident, January 19, 1984. Smiciklas was a driver for Ace Hardware at its regional distribution center in Arlington, Texas. He lived in nearby Grand Prairie. He made twice-a-week deliveries to Ace stores in the New Orleans area on a route that took him down Hwy. 1 through Red River Parish. Champion, who lived in Duncan, Oklahoma, was a driver for Groendyke Transport. On the date of the accident, he was the last in a three-truck convoy carrying carbon-black oil from the Exxon Plant in Port Allen to a waste processing plant in Shamrock, Texas. Although this was a one-time job for Champion, he had driven the route often, north on Hwy. 1.
Smiciklas's and Champion's paths crossed about .8 miles south of the little town of Armistead, almost in front of the Red River Co-op. At that point, Hwy. 1 is a two-lane road with paved shoulders. It makes a broad curve to the left, reckoned from southbound; the Co-op is located on the east side of the highway. It was about 2:30 on a cold, clear afternoon and the pavement was dry.
Smiciklas claims that he slowed down to cross the railroad tracks at the south side of Armistead. After he crossed them, he began to pick up speed and checked his rear-view mirrors. When he looked up, he testified he saw an oncoming Groendyke truck either in his southbound lane or "hugging the line." Smiciklas also saw, in that instant, a mini-camper parked or moving slowly onto the right-hand shoulder. There was substantial evidence to show that the mini-camper was driving around a pickup truck that was waiting for a left turn into the Co-op and that at least one other vehicle was waiting behind it. Smiciklas even admitted seeing the turning truck and the waiting vehicles in a statement given a few days after the accident. R.p. 812. At trial, when he denied seeing the turning truck and the waiting cars, he claimed that if the camper had not been there, he could have moved onto the shoulder and averted the collision, but as it was he had no alternative but to hit his brakes hard. He left 156 feet of skid marks that start close to the right side of his lane and swerve gently towards the center. The skid marks end where Smiciklas's truck started to jackknife. This hurtled the cab of Smiciklas's truck into the northbound lane and into the Groendyke truck. The point of impact, or at least the "area of impact," was about one and a half feet across the centerline, in Champion's northbound lane, and about 196 feet north of the driveway to the Co-op. The Groendyke truck left no skid marks, suggesting that Champion never touched his brakes. At trial, Champion denied any recollection of how the accident happened; however, a policeman who interviewed Champion a few days after the accident, Trooper Porter, testified that Champion told him he had caught a glimpse of "the Ace truck skidding." R.p. 809. Upon impact, Smiciklas's truck completed the jackknife. The force knocked the Groendyke truck completely off the road; it fell sideways into the ditch. Smiciklas's truck skidded another 75 feet before coming to rest at an angle in the middle of the road. Both drivers were seriously injured.
A few details from the chain of events immediately following the accident are significant because, according to the appellants, they show that Champion was at fault. First was Champion's statement to the EMS driver, Trooper Webb, who carried him from the scene to the hospital in Coushatta. Trooper Webb testified that when he asked Champion how the accident happened, he replied, "No comment." Later, when Champion had been transferred to Doctor's Hospital in Shreveport, he was treated by Dr. Faludi, who prepared a "medical statement" concerning the injury. According to this statement, Champion was in a head-on collision because he "came around the curve too far into the opposite lane." Champion counters these statements by asserting that he has no recollection of the accident, the incidents following it, or of ever talking to Trooper Webb or Dr. Faludi. For his part, Dr. Faludi stressed that he could not say more probably than not that Champion was the person *778 who provided the description of the accident. R.p. 742.
Both Smiciklas and Champion filed suits as a result of the accident. Champion's suit, filed in East Baton Rouge Parish, sought damages for his injuries, loss of consortium for his wife, and property losses for Groendyke. It named as defendants Ace Hardware and its insurer, Sentry Insurance Company. Sentry reconvened to recover the property damage it paid on the truck Smiciklas drove. The suit was transferred to Red River Parish and consolidated with Smiciklas's suit. It was eventually settled and dismissed except for Sentry's reconvention.
Smiciklas's suit, filed in Red River Parish, sought damages for his personal injuries and loss of consortium for his wife. It named as defendants Champion, Groendyke Transport and its insurer, North Star Reinsurance Corp. Sentry intervened, aligning itself with the plaintiffs to collect the workers comp benefits it had paid to Smiciklas.
After extensive pre-trial filings and motions, the case came to trial before a jury in March 1986. The trial was long, including not only live testimony from almost two dozen witnesses, but videotaped or depositional testimony from several witnesses. Both sides used experts to reconstruct the accident. The plaintiff submitted special jury instructions, many of which the trial judge declined to give, using instead his own instructions. The jury specifically found that Gary Champion was not at fault in causing the accident. The trial judge accordingly dismissed the claims of Smiciklas, his wife, Ace Hardware and Sentry. These parties have appealed devolutively.

ASSIGNMENTS 1-4
By their first four assignments, appellants lodge various complaints about the trial judge's jury instructions. They first claim the judge mistakenly refused to give a requested instruction about the weight to be given to expert testimony. They also claim the instructions about negligence, causation and comparative negligence were confusing, misleading and incorrect.
We have closely searched this record for any indication that Smiciklas objected to the judge's jury instructions. There is none. LSA-C.C.P. art. 1793 C provides:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Without an objection, appellants cannot now assign as error their complaints with the jury instructions. We therefore have no authorization to consider the claims. See Flettrich v. Jacob, 427 So.2d 492 (La. App. 5th Cir.1983); Ainsworth v. Bituminous Cas. Co., 379 So.2d 1187 (La.App. 3d Cir.1980), writ denied 381 So.2d 1233, 1234 (La.1980).
Appellants contend that matters pertaining to the instructions were decided by the trial judge in an in camera, off-the-record meeting. The details of this meeting cannot be proved, and the situation points to exactly why the Code requires an objection. The appellate court cannot tell from the record whether the appellants voiced their complaints and gave the trial judge the chance to make changes or to explain why he would not make changes. In essence, we have one side saying that it disputed the jury instructions, and the other saying the opposite. The Code instructs us to rely on the record, which in this case contains no objection.
Out of abundant caution, we have examined these assignments under the assumption that the appellants did in fact voice complaints which the trial judge denied. In each instance, the substance of the assignment is meritless.
With respect to the first and second assignments, appellants requested an instruction on the proper weight to which expert testimony is entitled. The proposed instructions correctly stated the law under Mayon v. Delta Well Logging Serv. Inc., *779 167 So.2d 418 (La.App. 1st Cir.1964), writ denied 246 La. 913, 168 So.2d 823 (1964):
(A) The theory advanced by an expert witness need not be accepted if it is contrary to positive testimony of eye witnesses.
(B) Where there are eyewitnesses, it is not possible to disregard their testimony to accept the theory of an expert.
(C) Expert's tests and experiments predicated upon assumption, not necessarily proved, or upon variable factors which are not established with reasonable certainty and precision should not be accepted by the jury.
The trial judge's instruction was as follows:
If you decide that the opinion of an expert witness is not based on sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely. R.p. 1211.
The instructions given are plainly so close to those requested that any argument otherwise borders on frivolous.
By the third assignment, appellants claim the instructions erroneously led the jury to think that the place of impact was determinative of fault. The evidence unequivocally proved that Smiciklas crossed the centerline and hit Champion. This leads to a presumption that Smiciklas was at fault. LSA-R.S. 32:71, 79(1); Rigouts v. Larkan, 244 La. 479, 153 So.2d 363 (1963). Appellants wanted the instruction to make clear that this presumption was rebuttable, as in the case of a sudden emergency. Cf. Johnson v. McKay, 306 So.2d 417 (La.App. 3d Cir.1975). However, a jury charge is not erroneous for failing to state that this particular presumption is rebuttable. Broussard v. Texas Industries Inc., 416 So.2d 1349 (La.App. 3d Cir.1982). The trial judge then gave a very thorough explanation of the sudden emergency doctrine, whereby if the jury found that Champion had encroached first, then Smiciklas's swift and imprudent reaction could be excused. The jury obviously felt that Champion never crossed the centerline. The judge finally re-stated the presumption, tying it specifically to the doctrine of sudden emergency. The effect of this repetition was not misleading or confusing. This assignment would not present reversible error.
By the fourth assignment, appellants claim the instructions were so confusing as to prevent the jury from considering comparative negligence. This claim, however is completely unsupported by the record. The instructions read:
The law provides that contributory negligence, which means the negligence of the plaintiff, shall not bar recovery of damages. The percentage, zero to one-hundred percent of negligence you find for each party, should be stated in the appropriate verdict form, unless you find the plaintiffs or a defendant was free from negligence. In essence, you are to make a fair and equitable distribution of fault under the facts as you find them. R.p. 1214.
This is a clear and comprehensible direction to allocate fault according to the facts. This assignment lacks merit.
For the reasons expressed, none of these assignments presents reversible error.

ASSIGNMENT NO. 5
By this assignment, appellants claim the jury's verdict was manifestly erroneous. They assert there was no evidence to support the finding that Champion was free of fault. In support, they cite parts of the witnesses' testimony that might support a finding of fault, and bear down very hard on the reconstruction theory of their expert, Mr. Ray Herd. To analyze this claim, we have had to study the evidence closely. To prove manifest error, an appellant need not show that there is no evidence in support of the verdict, but rather than the evidence taken as a whole makes the verdict clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Even under this standard, we cannot say that the jury's verdict is manifestly erroneous.
*780 In addition to Smiciklas, there were several witnesses whose accounts were crucial to reconstructing the accident. The first of these was Mr. Woster Anderson. He was driving the pickup truck that was waiting to turn left into the Co-op. He testified that he had driven south down Hwy. 1 and come to the Co-op's driveway. He had to wait for a line of 18-wheel tankers to clear before he could turn. They were not speeding and appeared to be driving completely in the proper lane of traffic. Anderson remembered that there was a four-wheel drive truck waiting behind him. When the last tanker passed and the road was clear, Anderson made his turn into the driveway. He suddenly heard a tremendous crash. At trial, he testified he did not know how much time elapsed between when he made his turn and when he heard the crash; on the day of the accident, however, he told an investigator that it was about seven seconds. He also stated positively to investigating officers that the tanker behind which he turned was the tanker in the accident. R.p. 758.
The next important witness was Mr. Billy Matthews, the driver of the pickup that stopped right behind Anderson. He testified that coming around the bend, he saw Anderson waiting. He admitted he had to hit his brakes hard to avoid running into him. He also remembered that a camper trailer, which had been behind him, scooted onto the shoulder to drive around him and Anderson. He testified that the crash came very soon after Anderson turned, within no more than three seconds. In an earlier deposition, he had said it was perhaps four or five seconds. He was positive that the last passing tanker was the one in the accident. R.p. 1093.
The next important witness was Mr. Lee Murphy, the Groendyke driver at the front door of the convoy. He testified that Champion was driving the last truck; the middle was being driven by a Calvin Wilson, who did not testify. Murphy was keeping contact with Wilson and Champion by C.B. radio. They were going approximately 55 m.p.h. Murphy testified that he could see Champion in the mirror on straight stretches of road but not around a curve; he did not see the accident. After he had crossed the tracks at Armistead, he heard over the C.B. that there had been an accident involving a Groendyke truck. He turned back and found the third truck lying sideways in the ditch.
There was a controversial witness, Mr. Paul Horion, on whom Smiciklas relied very heavily at trial and in appellate brief. Horion was allegedly riding directly behind Champion's tanker at a distance of one trucklength, north on Hwy. 1. He claims to have clearly seen Champion encroach over the centerline, just as Smiciklas claims. Since Horion lives in Dallas and is out of subpoena's reach, his testimony was read to the jury from a deposition. Despite appellants' faith and reliance on this testimony, we are constrained to say that the jury would not have been in error to find it not very helpful or reliable. Horion is fuzzy on details like how far Champion swerved across the centerline; he gives no description of how the collision occurred, or what it looked like, except to say that the Ace truck never jackknifed until after the impact, contrary to the opinion of both experts; and he admits remembering little about the scene. Horion's Dep., 40. In addition to these problems of accuracy and memory, there was no corroborating evidence to show that Horion was really there. No one from among the witnesses, medical technicians, law enforcement officers and passers-by who assisted, could remember seeing Horion or his Chemical Express truck at the scene. Both experts stated that anybody driving one trucklength behind Champion would definitely have careened into the tangled trucks and been a part of the accident. R.p.p. 1133 (Dart); 895 (Herd). Given the lack of evidence of Horion's presence, the expert opinions and the haziness of his account, not to mention the strange circumstances of how the plaintiffs found him, we find that the jury would be justified in completely disregarding this deposition. We have also disregarded it.
There was one piece of physical evidence that bore heavily on the reconstruction of the accident. The brakes on Smiciklas's *781 truck were not working properly. According to Trooper Porter, the brakes on the trailer were not stopping as fast as on the tractor, so when the whole system was applied, the trailer pushed into the tractor, causing the tractor to jackknife. R.p.p. 819-820. Smiciklas admitted also that the brakes on the front wheels were disconnected. R.p. 712. Ray Herd, the plaintiff's reconstruction expert, substantiated this: the trailer wheels and the front wheels left no skid marks. R.p. 862. This shows that a significant part of Smiciklas's braking power was not functional; no explanation for the deficiency was offered. Both experts stated that if the brakes had been working properly, the accident could have been avoided. R.p.p. 1123 (Dart); 912 (Herd).
This leads directly to the theories advanced by the accident reconstruction experts. The defendants' expert, Mr. Olin Dart, examined the various depositions and photographs. He personally inspected the scene in December 1985. He relied on Anderson's statement that he turned directly after the last Groendyke truck, the one that was involved in the accident; Matthews substantiated this. He noted that both Anderson and Matthews placed Champion completely inside his own lane when he passed them. He also noted that Matthews had a hard time stopping behind Anderson, and thought that Smiciklas might have had the same problem when he came around the curve. He particularly noted Smiciklas's admitted moment of inattention when he looked in the rear view mirrors, and the deficient brakes. He theorized that after Smiciklas crossed the tracks, he looked away from the road and began to pick up speed. When next he looked ahead, he saw Anderson and Matthews stopped in his lane, and a camper on the shoulder. He applied his brakes, but they were insufficient to stop him in time. He jammed them harder, skidded, lost control and suddenly jackknifed into the northbound lane where Champion happened to be. Mr. Dart discounted Smiciklas's story that Champion had encroached: this would have required Champion to weave in and out of his lane within a space of about 150 feet, or under three seconds at 45 m.p.h., and would have contradicted Anderson's and Matthews' direct testimony that he was inside his lane before the driveway. He concluded that the cause of the accident was Smiciklas's failure to ascertain the hazard soon enough; Champion's only contribution to it was "being there." R.p. 1121, 1136. Mr. Dart admitted that he formulated the theory without having read Anderson's deposition or personally checking the brakes on Smiciklas's truck.
The plaintiff's expert, Mr. Ray Herd, visited the scene in February 1984 and took measurements. He also examined the photographs and the police report. He dwelt particularly on Anderson's statement in deposition and repeated at trial that he heard the crash several seconds after he turned into the Co-op, and was well onto the parking lot rather than just off the road when the accident occurred. Mr. Herd thought that if this much time actually elapsed between the turn and the crash, then Anderson must have been mistaken as to whether he turned behind the third Groendyke truck. Mr. Herd thought Anderson must have turned after the second Groendyke truck, and the third must have passed by seconds later. Meanwhile, the vehicles like Matthews' truck and the mini-camper proceeded southward, freeing a longer stretch of the southbound lane. When Champion came around, he must have taken the curve too broadly and encroached into this free area, directly into Smiciklas's path. Even though Champion maneuvered back into the northbound lane before impact, his momentary encroachment placed Smiciklas in a sudden emergency and started the chain of events that led to the collision. Smiciklas reacted by braking and eventually jamming the brakes, going into a skid and finally jackknifing, hitting Champion in the northbound lane. Because of the sudden emergency, Mr. Herd thought Smiciklas was not at fault. Mr. Herd also asserted that Smiciklas was not reacting to the southbound vehicles, for which he could have stopped easily, but rather to the oncoming Groendyke truck that had swerved into the wrong lane.
*782 To this theory, appellants add Champion's "no comment" remark to Trooper Webb, the medical statement from Dr. Faludi, and inferences from Champion's claimed inability to remember the accident. All of this, they claim, shows that Champion was covering up his guilt and that the accident really happened as Mr. Herd says. This, they claim, makes the verdict manifestly erroneous.
We disagree. Mr. Herd's theory, though plausible, is fraught with difficulties that the defense exposed to the jury. First and foremost, the theory relies exclusively on Anderson's estimate of the time between his turn and the crash. This estimate was not very accurate. At trial, Anderson said it was seven seconds, but at one point said it was four or five, and admitted that he did not really know. R.p.p. 769, 893, 760. Even if an approximate time frame of four to seven seconds is accepted, it was flatly contradicted by Matthews, who said the time was no more than three seconds. R.p. 1092. Both experts admitted that a witness's perception of time in an emergency situation is inaccurate. R.p.p. 1156 (Dart); 709 (Herd). Thus Mr. Herd's theory depends on a very close scrutiny of the least accurate portion of Anderson's testimony and disregards the positive observation to investigating officers that he turned after the last truck, the truck that was in the accident. This disregarded testimony was corroborated by Matthews. Mr. Herd's preference for the less reliable information in constructing his theory tends to shake its foundations.
Moreover, Mr. Herd's theory is inconsistent with Smiciklas's first reported version of events. Under the theory, Anderson turned after the second Groendyke truck and was out of the way by the time Champion came along and crossed the centerline. If this is true, then Smiciklas should not have seen the third Groendyke truck between himself and Anderson's turning vehicle. Indeed, at trial Smiciklas denied seeing Anderson's truck at all. R.p. 705. However, in a statement to Trooper Porter a few days after the accident, he admitted seeing Anderson's turning truck and three or four cars waiting behind it. According to the statement, these were further down the road than the impending Groendyke truck. See Smiciklas Exhibit No. 75; R.p. 812. This is a recognition from Smiciklas himself that Anderson was still turning after Champion had passed, and this conflicts with Mr. Herd's reconstruction of the events.
The jury was entitled to balance Mr. Herd's opinion against these facts and, if it found the facts more persuasive, to disregard the opinion. See R.p. 1211 (jury instruction); Nailor v. Int'l Harvester Co., 430 So.2d 784 (La.App. 5th Cir.1983), writ denied 437 So.2d 1148 (La.1983). We are unable to say that the jury's decision was clearly wrong.
Appellants argue alternatively that the evidence mandates a finding that Champion was at least partly at fault. However, Mr. Dart's theory completely discounted appellants' suggestion that Champion could have swerved onto the east shoulder and avoided the accident. After skidding 156 feet inside the correct lane, Smiciklas's truck made a sudden jackknife. By then Champion was so close he could not possibly have reacted in time. Even if he had swerved, Smiciklas would still very likely have hit part of the Groendyke truck and caused the accident. The evidence does not prove any negligence on Champion's part.
There is moreover an undercurrent in appellants' argument that the allegedly substantial evidence in favor of Mr. Herd's theory, while not enough to make a preponderance of evidence, surely must prove at least some negligence on Champion's part. We have not accepted this view. Even a small percentage of negligence must be proved by a preponderance of the evidence. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985); Bordelon v. Aetna Cas. & Sur. Co., 494 So.2d 1283 (La.App. 2d Cir.1986).
In conclusion, the jury's decision to absolve Champion of fault is not manifestly erroneous. Mr. Herd's theory notwithstanding, there was substantial evidence to support a conclusion that Smiciklas failed to perceive the stopped traffic soon enough. His late reaction and the defective *783 brakes caused the accident, not Champion's alleged conduct. Moreover, the statement to Trooper Webb and the "medical statement" from Dr. Faludi do not strike us as persuasive of negligence. After being pulled from the wreckage, Champion was groggy and had a serious head injury. Although he was not amnesic, he was disoriented enough to give an incorrect home address to the admissions personnel at the hospital in Coushatta. R.p. 1068. Given the context of the severe trauma and injury, the jury was entitled to attach little weight to the "no comment" statement reported by Trooper Webb, as well as to any remark he may or may not have made to Dr. Faludi.
For these reasons, this assignment does not present reversible error. The judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.