CULPEPPER, Judge.
This is a suit for damages for personal injuries. The plaintiff, Luke J. Governale, was operating a pickup truck which was struck in the rear by a dump truck owned by the State of Louisiana, driven by defendant, Paul Suire, and insured by the defendant, The Travelers Insurance Company. Prior to trial, plaintiff dismissed his claim against defendant Suire, reserving his rights against defendant Travelers. The trial was limited to the issue of quantum, Travelers having admitted liability. Following a trial, the jury awarded plaintiff $5,000 in damages. The trial judge, adding $1702.58 in stipulated medical expenses to the jury’s award, signed a judgment awarding plaintiff $6702.58. The plaintiff appealed, seeking an increase in the award. Defendant answered plaintiff’s appeal, seeking a reduction of $1702.58 from the award.
The issues on appeal are: (1) Did the trial judge err in his instructions to the jury on burden of proof of damages? (2) If so, should the case be remanded for a new trial? (3) If not remanded, what damages are proved in the record before us?
The facts of the accident are not disputed. The plaintiff was negligently struck in the rear by a dump truck operated by the defendant’s insured. The impact forced the plaintiff’s' pickup truck forward, causing plaintiff’s head to snap backwards, striking the rear window of the vehicle.
What has been and remains in dispute is the nature and extent of the injuries caused by the accident. Plaintiff contends the inadequacy of the jury award of $5,000 can be traced directly to the trial court’s erroneous instructions that plaintiff was required to prove his damages to a “reasonable certainty”, rather than a “probability.”
JURY INSTRUCTIONS
The law governing the plaintiff’s burden of proof is set forth in Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971) where the court stated:
“[7] In Louisiana tort cases, the plaintiff must prove by a preponderance of the evidence both the negligence of the defendant and the damages caused by the latter’s fault; but proof need be only by a preponderance of the evidence, not by some artificially created greater standard. This burden of proof may be met by either direct or circumstantial evidence.
[8] In describing this burden of proof, the courts sometimes speak of proof to a ‘reasonable certainty’ or to a ‘legal certainty’; or of proof by evidence which is of ‘greater weight’ or ‘more convincing’ than that offered to the contrary; or (in the case of circumstantial evidence) of proof which excludes other reasonable hypotheses than the defendant’s tort with ‘a fair amount of certainty’. Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not.”
The plaintiff timely objected that the following instruction given by the trial judge erroneously held him to a higher burden of proof than the standard of probability established in Jordan:
“You are not permitted to award plaintiff an item of damage on mere speculation. This means that plaintiff is not entitled to anything for an item of damage if he only shows that it is possible or even probable that the item of damage was caused by the accident in question. In order for plaintiff to be entitled to any item of damage, the preponderance of evidence must be that it is reasonably certain that plaintiff has sustained the time [sic] of damage claimed and that the time [sic] of damages was caused by the *617 accident in question.” (Emphasis supplied)
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), our Supreme Court had occasion to examine a trial judge’s use of almost identical language. In that case, the jury was instructed that plaintiff could not recover “if he only shows that it is possible or even probable that the item of damage exists, or would exist, or that it is possible or even probable that the item of damage was caused by the accident in question.” Citing Jordan as authority, the Supreme Court held that the charge was not correct.
REMAND
Here, as in Arceneaux, the charges •to the jury on the burden of proof of damages were not correct. Nevertheless, this case need not be remanded for a new trial. All of the necessary evidence is in the record before us. In Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), our Supreme Court stated:
“Since the jury verdict was not based upon or guided by an essential and correct legal principle, the Court of Appeal properly decided to give no weight to the judgment of the trial court which implemented the jury verdict. However, the Court of Appeal then remanded the case to the trial court for a new trial. We conclude that this latter action was erroneous.
“[3,4] While the trial court remains the original forum for resolving factual and legal issues, the Louisiana Constitution expressly extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law. Accordingly, appellate courts render judgments on the merits when the trial court has made a consequential but erroneous ruling on the exclusion or admission of evidence. Likewise, when an appellate court has all the facts before it, a trial judge’s erroneous instruction to the jury does not warrant a remand.” (citation omitted)
DAMAGES
The first question is- what injuries resulted from the July 10, 1975 accident. Plaintiff sustained head and neck injuries which admittedly subsided. The substantial issue is whether the July 10, 1975 accident caused permanent injury to the inner right ear, with resulting periodic dizzy spells.
The evidence shows that on the day of the accident plaintiff went to the emergency room at Abbeville General Hospital with complaints of a headache and pain in the neck area. He was examined by Dr. Aud-ley Hebert, who diagnosed an injury to the head and neck. However, Dr. Hebert testified the physical findings were unimpressive. He found no muscle spasm, the x-rays were negative and the neck had a normal curvature. Nevertheless, he stated he had no reason to doubt plaintiff’s subjective complaints. Dr. Hebert prescribed physiotherapy and diathermy treatments, instructing the plaintiff to refrain from work and to return in one week.
The plaintiff made a return visit within four days and again within another week, each time complaining of no improvement. After continued treatment, plaintiff did show improvement on August 5, 1975. He was discharged from Dr. Hebert’s care on August 13, 1975, with instructions to begin his return to work with light duties before resuming full duties.
On cross-examination, Dr. Hebert testified that his records did not reflect, nor did he recall any complaints of dizzy spells. In particular, his record of the August 5 visit did not contain any reference to a dizzy spell occurring on July 22, 1975. However, Dr. Hebert’s records contained a report dated October 13, 1975, wherein there was a reference to “dizzy spells”. He also stated that none of the tests administered by him were specifically designed to detect abnormalities of the inner ear.
During defendant’s case, Dr. Hebert was re-examined concerning the October 13 report. He explained that after his first testimony, he questioned his office staff and learned that a temporary employee had filled out the report in response to a request from the plaintiff. The doctor stated that a *618 “note” from the plaintiff was attached to the report and that the reference to dizzy spells was taken from the note and not from Dr. Hebert’s files.
On September 15, 1975, the plaintiff saw Dr. Robert Paul Blereau, apparently at the request of his employer. Dr. Blereau’s records showed that he saw plaintiff only on this one occasion for approximately ten minutes. He found no objective signs of injury but, based on plaintiff’s subjective complaints, diagnosed a neck strain. Dr. Blereau’s record did not contain any mention of a hearing loss, vertigo or dizziness of any kind.
On November 3, 1975, plaintiff was referred to Dr. S. Goldware by his employer’s workmen’s compensation insurer. At this time, plaintiff’s primary complaint involved dizzy spells. The history related to Dr. Goldware included a report of dizzy spells in 1975 on July 22, August 1st, 14th and 20th, and September 2d and 29th. These dates and other information were recorded in a diary which the plaintiff gave to Dr. Gold-ware. Plaintiff testified that while driving on September 2, 1975 he suffered a dizzy spell and ran off the road, injuring his chest. He also states that on September 29, he suffered a dizzy spell, while working on a diesel engine, and fell four to six feet, hitting the back of his head on the steel floor.
Dr. Goldware’s initial examination showed no evidence of a condition which might have caused the dizzy spells. However, he admitted plaintiff to the Lafayette General Hospital for treatment and diagnostic evaluation from November 9 to November 14, 1975. Working in consultation with Dr. Goldware were Dr. Robert Martinez, a neurologist, and Dr. Paul Zehnder, a specialist in the field of otolaryngology, especially the ears.
Dr. Martinez elicited from the plaintiff a detailed medical history which included a seizure occurring some 10 — 15 years earlier. Based on tests performed, he concluded that this seizure had no relationship to present complaints. He diagnosed a “post-traumatic” disorder and stated that from the history given by plaintiff the accident on July 10, 1975 was the most likely cause of plaintiff’s headaches and neck aches.
Dr. Zehnder did a complete ear, nose and throat analysis and performed additional tests to explore a possible ear injury. These tests, an audiogram and an electroencephalogram (ENG), were designed to develop information that an x-ray or physical examination would not show: On the basis of the ENG, Dr. Zehnder diagnosed a dysfunction of the right ear as the cause of plaintiff’s dizzy spells.
Dr. Zehnder also found a high decibel loss of hearing, which he first attributed to the noise exposure of plaintiff’s job. Upon reexamination and a second ENG immediately prior to trial, this opinion changed. Contrary to Dr. Zehnder’s expectation, plaintiff showed an improvement in hearing which the doctor predicted would continue until it reached a normal level in several months. Due to the fact that a noise induced loss would not have improved, the doctor felt that the loss was caused by a trauma, confirming the earlier diagnosis of an injury to the ear. At no time was this hearing loss considered to be a disability because the loss was above the normal speaking range.
Given the history of the accident on July 10,1975, Dr. Zehnder opined that was probably the cause of the injury to the inner ear. He did state, however, that if the symptoms from the July accident had cleared, it would be more probable that the condition complained of related to the fall on September 29, where plaintiff hit the back of his head.
The medical testimony supports the existence of at least temporary injury to plaintiff’s right inner ear with resulting dizzy spells. The issue is whether the evidence as a whole shows it is more probable than not that these injuries were caused by the accident on July 10, 1975.-
The question of causation appears to be contingent upon acceptance of the plaintiff’s assertion that the “spells” began on July 22, 1975. He testified at length concerning these spells, relying primarily on the “diary” as a true record of events. *619 Hence, proof of causation depends largely upon acceptance of the “diary” as corroboration of plaintiff’s testimony.
The plaintiff stated that he kept the “diary” to make it easier to explain his symptoms to the doctor. But, plaintiff admits he did not mention the diary to Dr. Hebert, nor did he mention the dizzy spells to that doctor prior to the time Dr. Hebert discharged him on August 13.
The diary also indicates that plaintiff’s employer was aware of some continuing medical problem. Following an account of the September 2 accident, there is a reference to his “boss’ ” suggestion that he get another physical and reference to a visit to the “Company doctor” on September 15, 1976. The entry on October 9, 1976 indicates that plaintiff’s employer had become so insistent that he saw a Dr. Trahan for diagnostic tests. The entry on October 10, 1975 states that the company was arranging an appointment with a neurological surgeon in Lafayette.
The above entries in the diary are consistent with some of the facts as they occurred. Plaintiff did see Dr. Blereau on September 15, 1975. Also, plaintiff’s employer’s workmen’s compensation insurer did arrange for plaintiff to see Dr. Goldware. Furthermore, the shop foreman, Leroy Theriot, testified he knew of the dizzy spells. The most interesting point of possible corroboration is the October 6,1975 entry that makes reference to a call to Dr. Hebert’s office. According to the notes, a “desk clerk” at the office was mailing a medical report. Dr. Hebert testified an employee provided the information found on the October 13 report, but without his authorization or knowledge.-
It should be noted that the plaintiff was a very poor witness. His most frequent response, even on direct examination, was “I don’t recall.” Some responses were contradictory. He offered no explanation for his failure to report his dizzy spells to Drs. Hebert or Blereau, even though the visit to Blereau was supposedly prompted by the accident on September 2.
We conclude plaintiff failed to prove by a preponderance of the evidence that it is more probable than not that the injury to the inner ear resulted from the July 10, 1975 accident. It is very difficult to believe that plaintiff was actually having dizzy spells and writing about them in his diary, which he said he was keeping for the express purpose of being able to tell the doctors about his symptoms, when we consider the fact that he did not actually tell either Dr. Hebert or Dr. Blereau about these dizzy spells.
An additional factor which weighs heavily against the plaintiff is that all during this time following the July 10, 1975 accident that he contends he was having these dizzy spells, he nevertheless continued to work, with no loss of wages and, actually, with substantial overtime pay. At the trial, plaintiff first testified to the effect that following the July 10,1975 accident he was incapable of working and that he lost all wages. However, the payroll clerk for plaintiff’s employer produced the records which showed that following the July 10, 1977 accident plaintiff never stopped working, and that he even earned substantial overtime. All of this seriously discredits plaintiff’s entire testimony.
Having concluded plaintiff failed to prove that the inner ear injury was caused by the July 10, 1975 accident, we do not reach the question of an award of damages for the inner ear injury. Plaintiff is entitled to damages only for the above described injury to the head and neck for which he was examined and treated by Dr. Hebert from July 10, 1975 until Dr. Hebert discharged him on August 13, 1975. The award of $5,000, to which defendant has not objected on appeal, is adequate to compensate plaintiff for general damages.
The defendant filed an answer to the appeal contending that the trial judge erred in adding the sum of $1702.58 in' special damages for medical expense to the jury’s award of general damages in the sum of $5,000. In his brief on appeal, plaintiff argues that defendant’s answer to the appeal was not timely filed. However, the record shows that plaintiff’s appeal was lodged in this court on June 27, 1979 and *620 that defendant’s answer to the appeal was filed on the same date. It was thus timely filed within the 15-day period provided by LSA-C.C.P. 2133.
In support of its answer to the appeal, defendant argues that the medical expenses were included in the jury’s award of $5,000. During the trial, it was stipulated that the amount of the medical expense was $1702.58. During its deliberations, the jury returned to the courtroom for clarification of the instruction concerning medical expenses. The court advised the jury that it was not to consider the amount of the medical expense. Obviously, the trial judge was of the view that since the amount of the medical expenses had been stipulated, there was nothing for the jury to decide, and it was the function of the judge to simply add the medical expense to the award of general damages by the jury. We find no error by the trial judge in following this procedure.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are. assessed against the plaintiff-appellant. '
AFFIRMED.